Della J. Westfall, Appellant, v. Bedford Lodge No. 91, I. O. O. F. Appellee.

**Benefit insurance:** ACTION TO RECOVER SICK BENEFITS: EVIDENCE. In this action for the recovery of sick benefits under by-laws of the order providing that it should pay no benefits for sickness or disability originating while a member was in arrears, or within thirty days after payment of such arrears, the evidence is held to show that deceased had recovered from a disease commencing while he was in arrears, and that another disease from which he died originated more than thirty days after payment of his arrearages. It is also held that in the absence of evidence to that effect no presumption arose that the latter disease resulted from or was in any way connected with the former.

*Appeal from Taylor District Court.*—Hon. H. K. Evans, Judge.

Thursday, October 17, 1912.

A SUIT in equity to require defendant to assess its members to provide a fund from which to pay benefits to which plaintiff is entitled, and for judgment therefor. The petition was dismissed, and plaintiff appeals.—*Reversed.*

*Wm. M. Jackson,* for appellant.

*W. R. Brant,* for appellee.

LADD, J.—R. B. Westfall became a member of Bedford Lodge No. 91, I. O. O. F., October 17, 1902. He died March 21, 1910. Article 61 of its constitution provided that: "Every member of this lodge who has been a contributing member thereof for six months, shall if he be by sickness or accident disabled or prevented from follow-

ing his ordinary avocation, so as to earn a living by the same, or at any other work which he can do, and if his disability is not caused by intemperance or other immoral conduct, receive for each full week of his disability the weekly benefit provided by the by-laws as herein directed." Section 62 authorized the lodge to provide for the funeral expenses of a member in good standing at the time of his death. Section 1 of the by-laws fixed the indemnity to be paid under article 61, and section 3 the expense under article 62, as follows:

Section 1: "If a member of the third degree, $4.00 per week for twenty-six weeks; $3.00 per week for thirteen weeks; $2.00 per week for thirteen weeks and one dollar per week thereafter during the continuance of the illness."

Section 3: "On the death of a brother of this lodge who was while living entitled to benefits, $60 shall be appropriated to defray his funeral expenses, which shall immediately be paid over to some relative authorized to receive the same."

"Good standing" is defined by section 6 to be: "Not three months in arrears for, dues, fines or assessments, and thirty days shall have elapsed after full payment of all dues and fines to date for such payment, and the member shall be clear from all penal charges on the books of the lodge."

Unless suspended as hereinafter explained, plaintiff was entitled to benefits and funeral expenses, and to recover the same is the object of this action.

The dues payable to defendant amounted to one dollar every three months, and decedent, while delinquent from October 1, 1908, to January 1, 1909, was taken sick with pneumonia, and, under article 58 of the constitution, was not entitled to benefits during sickness originating while in arrears. That article reads: "Whenever a member shall become indebted to the lodge for three months or more of dues, he shall, by reason of such indebtedness, without notice

or further proceeding, stand suspended from all pecuniary benefits until his indebtedness shall be fully paid, and for one month thereafter, and during the entire continuance of any sickness or disability which commenced or originated while said member was thus in arrears, or which commenced or originated during the thirty days succeeding payment of such arrearage. The term 'pecuniary benefits' herein used shall contain and include funeral benefits and funeral expenses."

On May 31, 1909, dues to October 1st of that year were remitted from Ames, Iowa, where decedent then lived, to the defendant at Bedford, and the check was marked "paid" by the bank at Ames June 3d. It is fair to assume that the dues reached defendant June 1st or 2d.

Two questions of fact arise: (1) Did decedent recover from his illness, which commenced in May, 1909; and (2) if he did, did the sickness resulting in his death originate within thirty days after the payment of the dues, as stated above?

The testimony of but two witnesses bears on these issues. The plaintiff, who is the widow of the decedent, testified as follows: "Q. Now, did he recover from that sickness? A. The doctor said so. Q. What did you say? A. We all thought so. . . . Q. And so far as you know and your medical advice extended, he recovered from that sickness? A. Yes, sir. Q. When did he recover and go to work? A. He never got able to go to work. He was going to work on the following Monday, and he took sick on Sunday again. Q. Well, what is the date that he recovered from his first sickness and got able to go to work, as he supposed? Give the court that date. A. I never thought of anything like this coming up and never paid any attention. . . . He must have recovered about the 1st of June, I should think. He recovered from pneumonia the latter part of June, I think. He took a new attack in about two weeks after he had recovered from the first

attack. In about two weeks he was seized with another attack. The last proved fatal."

On cross-examination she continued: "I don't know just what time he was taken sick. I could not say, because I never thought of anything like this coming up. I never paid any attention to it. From the time he first took sick, about June 2, 1909, he was never able to work. . . . He wasn't able to work; but before Monday came he took sick with this other disease, and never was able to work. Practically during all the time from June 2, 1909, up until his death he was entitled to benefits from the lodge, as claimed in the petition."

Upon being recalled, she testified that: "After June 2d he recovered from his pneumonia, about the 4th of July. He went home about the 7th of July, and was up and around, and the doctor thought he would be able to go to work the following Monday. After recovering from the pneumonia, he took a new complication of diseases, and from that he died—lingered and died."

The other witness was the father of plaintiff, who testified that he knew of decedent's illness, and further: "I went up there and stayed until he got up and around. He got up and around about the middle of June, I think. . . . I think I went up there about the 10th of June. Q. Did he recover from that illness? A. He got up and around, and the doctor told him he could go to work. . . . He was going to work, and got up and around and could go a couple of blocks, and we concluded that he was well enough, and we could come home. I concluded he had recovered from this attack of pneumonia. The doctor said he had, and all he wanted was a little rest. After that, in two or three weeks, he had a relapse, and was in a worse fix than he was the first time. This last sickness proved fatal, and he died. The doctor said it was nervous prostration and stomach trouble. That was a different disease than what I found him afflicted with in the first instance."

From this evidence no conclusion can well be drawn other than that decedent recovered from the attack of pneumonia. Both witnesses so testified, and also the attending physician had expressed a like opinion. This last may have been hearsay; but it went in without objection. His customary strength may not have been fully restored, and rest have been essential; but this does not negative the conclusion that from the particular sickness, i. e. pneumonia, which had commenced in May, he had recovered. There was no evidence to the contrary; nor was there any evidence indicating that either neurasthenia or the stomach trouble, with which he was subsequently afflicted, was the consequence of or in any wise connected with his previous malady, and this ought not to be assumed. According to plaintiff, he recovered in the latter part of June or forepart of July. She fixed July 7th as the date when he went home, and the Sunday following as the date when he was taken sick again. This would be more than thirty days after June 1st or 2d, when the arrears were paid. The other witness fixed the time of his recovery at about the middle of June, and he was taken sick again about two or three weeks afterwards. His testimony is not inconsistent with that of plaintiff, nor with the finding that the decedents last illness commenced after July 2d, and therefore more than thirty days subsequent to the payment of the dues which had matured. To hold otherwise the plaintiff's testimony must be rejected; and as the credibility of neither witness was assailed we are inclined to reach a conclusion in harmony with all the evidence adduced. Moreover, the certificate of two physicians who attended decedent have found their way into the record, and therefrom it appears that one of these treated him for pneumonia from May 18th to June 8th, and from the other that he first treated him for neurasthenia August 1st. These, if considered, tend to confirm the conclusion reached, that decedent recovered from pneumonia, and that neurasthenia

and stomach trouble did not originate within thirty days after the payment of the dues June 1 or 2, 1909. If it be suggested that one of these diseases was of slow development, and possibly originated even prior to the period of arrears, it is to be said that of this no evidence was adduced.

Relying upon the evidence, as we must, the conclusion necessarily follows that the sickness of decedent which resulted in death began more than thirty days after the payment of arrears. From that time he was sick thirty-six weeks, and under the schedule of the lodge was entitled to benefits amounting to $134 and $60 as funeral expenses. Of this, $35 has been paid, leaving $159 to which plaintiff, as widow of decedent, is entitled.—*Reversed.*